FILED
02/07/2024
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 10, 2023 Session

**STATE OF TENNESSEE v. GINNY ELIZABETH PARKER**

**Appeal from the Circuit Court for Williamson County**
**No. B-CR210047    Michael W. Binkley, Judge**

———————————————

**No. M2022-00955-CCA-R3-CD**

———————————————

The Defendant, Ginny Elizabeth Parker, was convicted following a bench trial of five counts of forgery, for which she received an effective six-year sentence to serve. On appeal, the Defendant argues that: (1) the evidence is insufficient to support her forgery convictions, specifically regarding whether she acted without authorization; (2) the trial court shifted the burden of service of medical records pursuant to Tennessee Code Annotated section 24-7-122(c) from the State to the Defendant; (3) the trial court erroneously admitted proof of a PayPal account that was linked to the victims' bank account; (4) she is entitled to relief based on cumulative error; and (5) her sentence is grossly disproportionate to her offenses, in violation of the Eighth Amendment to the United States Constitution and article I, section 16 of the Tennessee Constitution. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

E. Kendall White, IV, Nashville, Tennessee, for the appellant, Ginny Elizabeth Parker.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Kim R. Helper, District Attorney General; and Tammy Rettig and Hunter C. Knight, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.      FACTUAL AND PROCEDURAL HISTORY**

This case involves five checks that were drawn on the joint bank account of Lloyd and Rose Gordon, the Defendant's grandparents. The checks at issue are: (1) No. 4023 for $200, dated October 19, 2019, and cashed October 22, 2019; (2) No. 4027 for $200, dated October 22, 2019, and cashed November 12, 2019; (3) No. 4028 for $300, dated October 24, 2019, and cashed October 25, 2019; (4) No. 4029 for $300, dated October 24, 2019, and cashed November 5, 2019; and (5) No. 4055 for $230, dated February 7, 2020, and cashed February 10, 2020. The total value of the checks amounted to $1,230. Each was written to the Defendant, endorsed by the Defendant, cashed at First Federal Bank, and purportedly signed by Ms. Gordon, who passed away on April 11, 2020, and did not testify at trial.

A month after Ms. Gordon's death, Mr. Gordon reported the checks as stolen. An investigation ensued, and a Williamson County grand jury indicted the Defendant and charged her with five counts of forgery, a Class E felony. Tenn. Code Ann. § 39-14-114. The Defendant proceeded to a bench trial on September 27, 2021.

Prior to trial, the Defendant filed a motion in limine requesting the admission of the bank records from the Estate of Shirley Montgomery, the Defendant's deceased mother. The record does not contain a transcript of the hearing on this motion. The record does contain, however, a post-trial order from October 7, 2021, indicating that the trial court heard this September 24, 2021 motion, and at that time, denied the motion. The trial court found that the bank records were not admissible pursuant to the business records hearsay exception of Tennessee Rule of Evidence 803(6). It found that the Defendant did not qualify as a custodian of the records and could not establish the elements of the exception to the hearsay rule. Additionally, the trial court ruled "that the request made by [the] Defendant was made too late for the State to respond and that the proposed manner of introduction by [the] Defendant did not qualify as a business [record]."

Immediately preceding trial, a hearing was held regarding another of the Defendant's motions in limine, wherein the Defendant argued that the State had failed to serve her with Ms. Gordon's medical records sixty days prior to trial as required by Tennessee Code Annotated section 24-7-122(a) and (c). The State responded that it intended to use the medical records solely to show the dates Ms. Gordon was hospitalized and not for purposes relating to treatment. It argued that hospitalization dates did not fall within the purview of the Code section, that it gave proper notice to use the records under Tennessee Rule of Criminal Procedure 902(11), and that the Defendant had notice of the existence of the records from the State's discovery disclosure. Defense counsel admitted that he failed to see the State's notation in its discovery response that the records were too voluminous to include on its discovery disclosure CD-ROM but were available for in-

person review. Defense counsel, nonetheless, argued that the medical records should be excluded as it was the State's duty to timely serve them. The trial court denied the Defendant's motion, agreeing with the State that Code section -122 did not apply to show hospitalization dates and that "the burden of obtaining and then reviewing the records should not be placed on the State . . . when notice had been given of their existence" in their initial discovery response.[1] Defense counsel offered to stipulate to Ms. Gordon's hospitalization dates, but the trial court ruled that it would allow the State to present the records at trial.

During trial, Detective Joseph Cox of the Fairview Police Department testified that in May 2020 following Ms. Gordon's death, her husband, Mr. Lloyd Gordon, reported the five checks at issue as stolen. Mr. Gordon also made a report to First Federal Bank. He identified the Defendant and the Defendant's boyfriend, Mr. Brandon Clark, as the individuals he believed were responsible. Detective Cox obtained photographs of the individual cashing the checks at First Federal Bank and recognized the individual as the Defendant. Detective Cox went to speak with the Defendant at her house and was informed by Mr. Clark that the Defendant was not present. Mr. Clark called the Defendant in Detective Cox's presence and said that he and the Defendant would come to the police station to discuss the matter. The Defendant never came to the police station nor returned Detective Cox's messages. The Defendant was subsequently arrested and interviewed by Detective Cox. A recording of this interview was entered into evidence.

During the interview, the Defendant denied stealing money from her grandparents and said that she had permission from Ms. Gordon to write the checks. These checks helped the Defendant pay for her doctor appointments and prescriptions, as she had no job or insurance. The Defendant explained that Ms. Gordon would give her two or three checks at a time, and the Defendant would fill them out, cash them, and then report the amount she cashed them for to Ms. Gordon. According to the Defendant, Ms. Gordon would also write checks to Mr. Clark when the Defendant needed money and was unavailable to cash a check.

The Defendant stated Ms. Gordon used to write checks to the Defendant's mother, Ms. Montgomery, to cash and give to the Defendant. Later, however, the Defendant described that Ms. Gordon would give the checks to the Defendant to cash to give to Ms. Montgomery. The Defendant stated that when Ms. Montgomery died in September 2019, the Defendant repaid Mr. and Ms. Gordon $1,000 and gave Ms. Gordon $4,000 of the Defendant's money to deposit in Ms. Gordon's account; the Defendant explained that the

---

[1] The trial court entered a written order post-trial explaining its ruling.

checks at issue were drawn from this commingled money. The Defendant claimed to still have $2,300 or $2,600 of her own funds remaining in the account.

The Defendant accused her aunt and uncle, "Tonya" and "Floyd," of convincing Mr. Gordon that she and Mr. Clark took the money. She stated that Tonya and Floyd had "no means" but recently bought a new boat, truck, and jet ski. She then stated that Mr. Gordon had memory, vision, and hearing issues and that Ms. Gordon did not tell Mr. Gordon "everything."

When asked about PayPal transactions reflected in the Gordons' bank statements, the Defendant admitted to opening a PayPal account and, with Ms. Gordon's permission, linking it to the Gordons' bank account. She reported conducting only three or four transactions through the PayPal account.

During Detective Cox's investigation, he accessed the Gordons' bank records from December 2018 to October 2020. The account had three consistent deposits: two payments from social security and one from the Tennessee Consolidated Retirement System. The Gordons generally kept a $5,000 balance until the first check was written to the Defendant in October 2019. The checks at issue were made out to the Defendant personally and not to a doctor or pharmacy. Detective Cox noted that the checks were for round numbers and that such was not typical for commercial transactions. He was unable to locate a deposit from the Defendant other than a December 19, 2019 check for $1,000 that stated on the memo line "for loan repayment." The account reflected that Mr. Gordon had written a check to the Defendant for $1,000 dated October 30, 2019.

Detective Cox stated he believed the Defendant was not being truthful about the PayPal transactions because twenty-one PayPal transactions totaling $3,070.29 were processed through the Gordons' account prior to Mr. Gordon's closing it. Defense counsel objected to the relevance of the PayPal transactions, and the trial court ruled it was relevant because the Defendant had "testified"[2] to linking the Gordons' account to a PayPal account. According to Detective Cox, the PayPal account was created four days after the first October 2019 check was written to the Defendant. Several of these PayPal transactions were for online purchases from "URIBEMARKET" and "Love Jesus" and not for cash withdrawals. The PayPal transactions dated April 14 and 16, 2020, occurred after Ms. Gordon's death. Detective Cox explained that he did not obtain the records to verify the receiving account because the PayPal offices were outside of his jurisdiction.

---

[2] The trial court appears to be referencing the Defendant's interview with Detective Cox as the Defendant did not testify at trial.

- 4 -

The State introduced six checks written to Mr. Clark. The checks, signed by Ms. Gordon, endorsed by Mr. Clark, and cashed at Food Saver were: (1) No. 4057 for $300, dated February 16, 2020, and cashed February 18, 2020; (2) No. 4058 for $200, dated February 17, 2020, and cashed February 18, 2020, with a memo line reading "gutters"; (3) No. 4069 for $350, dated March 16, 2020, and cashed March 18, 2020; (4) No. 4071 for $250, dated March 17, 2020, and cashed March 19, 2020; (5) No. 4072 for $250, dated March 19, 2020, and cashed March 23, 2020; and (6) No. 4078 for $350, dated March 11, 2020, and cashed April 13, 2020. These checks totaled $2,050.

The State moved to enter Ms. Gordon's medical records to show her hospitalization dates. Despite its previous ruling that the medical records would be admissible at trial, the trial court asked if a stipulation to the dates could be entered in lieu of the records. The State agreed and stated it had a condensed summary showing only Ms. Gordon's hospitalization dates. Defense counsel responded, "I believe this to be an accurate representation. No objection to this." The State's summary was entered into evidence.[3] The summary showed the following dates of hospitalization for Ms. Gordon: (1) October 24, 2018, to October 26, 2018; (2) January 12, 2020, to January 16, 2020; (3) February 27, 2020, to March 2, 2020; and (4) March 9, 2020, to March 13, 2020.

Detective Cox testified that check No. 4078 to Mr. Clark was dated March 11, 2020, when Ms. Gordon was hospitalized, and cashed April 13, 2020, after Ms. Gordon was deceased. He further affirmed that PayPal transactions occurring on January 16, 2020, March 2, 2020, and March 9, 2020, happened when Ms. Gordon was either in the hospital, being admitted, or being discharged from the hospital.

Check and PayPal transactions continued to occur after Ms. Gordon's death until the Gordons' account was depleted and closed by Mr. Gordon. Detective Cox stated Ms. Gordon could not give permission for her account to be used after her death and that the checks to the Defendant and Mr. Clark and the PayPal transactions "wiped out" the Gordons' bank account. He stated if those transactions were rescinded, the account would still have a positive balance and be in "good order."

Detective Cox acknowledged that several checks were written to other family members during this timeframe, generally for round number amounts, and some with blank memo lines. Fourteen checks were written to Maggie Gordon totaling $2,395. Six checks were written to Shirley Montgomery totaling $1,375. Six checks were written to Mary

---

[3] The transcript notes "Exhibit #6-Certified Copies of Medical Records was marked and entered into evidence." However, the record contains no certified medical records, and the parties' discussions in the transcript indicate that the medical records were not admitted.

Thomas totaling $1,205. Four checks were written to Tonya Gordon totaling $832.33. Detective Cox acknowledged that Tonya Gordon was the aunt the Defendant mentioned during her interview as having recently purchased a truck, jet ski, and boat. Detective Cox opined that $832.33 was an insufficient amount to purchase these items. The checks written to these other family members totaled $5,807.33. As no reports were made against other individuals, no other family members were investigated. Detective Cox stated he had no banking information for the Defendant in order to subpoena her bank records for the investigation.

During the cross-examination of Detective Cox, defense counsel attempted to enter a copy of bank records from Ms. Montgomery's Estate. The State objected, arguing the trial court had previously ruled that the Defendant was not the custodian of these records and that Detective Cox likewise could not authenticate them. The trial court excluded the records.

Mr. Gordon testified that he and Ms. Gordon were married for sixty years. Ms. Gordon was in charge of their finances. While he stated he did not know anything about the finances, he recalled Ms. Gordon's only ever writing the Defendant two checks: one for $15 and the other for $30. Mr. Gordon did not know Mr. Clark and said that neither he nor Ms. Gordon would have paid Mr. Clark's bills. Prior to these events, he could not recall the account's ever being overdrawn. When asked if he or Ms. Gordon ever paid the bills for anyone but themselves, Mr. Gordon replied, "No ma'am. No ma'am. No."

The Defendant elected not to testify or put on proof. The trial court took the matter under advisement and requested that the parties prepare a brief related to whether circumstantial evidence, primarily reflecting on the Defendant's credibility, could be used to establish the authorization element in forgery. Both parties submitted memoranda addressing this issue.

On November 12, 2021, the trial court orally found the Defendant guilty. It determined that its experience as a trial lawyer, its experience with people and events, "the collateral facts in this case[,]" and "the circumstances, including the issues of credibility of [the Defendant]," allowed it to make a logical inference that the Defendant acted without authorization.

On November 19, 2021, before judgments of guilt were entered, the parties again appeared before the trial court. The trial court again addressed the issue of whether it could draw inferences from the Defendant's credibility that a forgery occurred and stated this was an "academic discussion more than anything." The State again argued that the trial

court was permitted to use its experience and draw inferences from the circumstantial evidence. The Defendant argued the trial court could not rely on circumstantial evidence or "suspicious evidence." Defense counsel inquired, "The fact that we are still here, still tortured over this issue . . . would that not be reasonable doubt?" The trial court responded,

> Well, that's kind of what I just said. I think that is a good point. I just need to think about it. It's just, I mean, it's a serious issue and I have got to look at the proof and decide whether or not I can make that inference from the, to me, obvious issues of credibility with the [D]efendant.

The trial court asked the parties to prepare memoranda on the issue with competing proposed orders. While selecting the Defendant's next court date, defense counsel stated that he believed the presentence report could be prepared by mid-January. The trial court asked the parties to coordinate their schedules with the timing of the presentence report so an order could be entered that day.

On March 4, 2022, the trial court entered its findings of guilt. In its findings, the trial court discussed *State v. Dorantes*, 331 S.W.3d 370, (Tenn. 2011), and the Tennessee Pattern Jury Instructions concerning the reasonable doubt standard and the use of direct and circumstantial evidence. It reasoned that it could consider collateral facts and circumstances which did not directly prove the fact at issue but from which facts could be logically inferred. It further stated that our supreme court in *Dorantes* directed the trier of fact to use its experience with people and events. *See* 331 S.W.3d at 370. It noted facts from the case, including: (1) the Defendant lied about making deposits, including the $4,000 deposit, into the Gordons' account; (2) the Defendant claimed that some of the money in the account was hers, but the $1,000 loan and repayment would not have been necessary if that were true; (3) the Defendant laid blame on others by pointing out her aunt and uncle had gotten a new truck, boat, and jet ski, however, these relatives only received $832.33, which Detective Cox opined was not enough to purchase these items; (4) the Defendant admitted responsibility for the PayPal account, and five of these PayPal transactions occurred while Ms. Gordon was either hospitalized, being admitted or discharged, or deceased; (5) the Defendant lied about the number of PayPal transactions; (6) the Defendant claimed that the checks were for doctor's appointments and prescriptions, but all the checks were cashed at a bank; (7) every check was for a round number which is not typical for a commercial transaction; (8) the Gordons' bank account was overdrawn and to believe these acts were authorized would require the belief that Mr. Gordon consented to having all his money spent; and (9) the checks had widely varying dates as to when they were dated and when they were cashed, including check Nos. 4028 and 4029, which were both written on October 24, 2019, and cashed eleven days apart.

The trial court found that these collateral facts and circumstances, when viewed with the trial court's experience with people and events as a trial lawyer for thirty-five years and time as a judge, proved the Defendant acted without authorization.

On March 18, 2022, a sentencing hearing was held. Defense counsel requested split confinement and stated the Defendant wanted assistance with her drug problem. Defense counsel also acknowledged that the Defendant had committed a theft while awaiting the resolution of her trial for her forgery charges. Counsel stated that the Defendant had been released on bond since May 2021, had passed all her drug screens, and had no violent history. The trial court requested that defense counsel prepare a treatment plan for the Defendant that the trial court could review when considering an alternative sentence.

When the sentencing hearing resumed on April 8, 2022, the State introduced the presentence report and certified copies of the Defendant's prior convictions for six felonies and six misdemeanors. The State further submitted proof of two probation revocation orders that the Defendant received for her sentence on a sale of schedule II drugs conviction. The defense conceded that the Defendant was a Range II, multiple offender. Amy Hill with Probation Services testified that she had issued ten drug tests to the Defendant while the Defendant was on bond and that all tests were negative. During the Defendant's allocution, she stated that her drug issues began after having surgery for a brain tumor and being treated with steroids post-surgery. Defense counsel entered evidence of the Defendant's acceptance to Centerstone, a substance rehabilitation program.

The trial court considered the presentence report, the principles and purposes of sentencing, the Defendant's education and prior convictions, and the enhancing and mitigating factors. It stated that neither the evidence submitted nor the Defendant's allocution indicated that the Defendant suffered from a current drug problem or a mental health issue that suggested she would benefit from a treatment program. It noted that the Defendant had not taken her prior probation seriously and that she had a lengthy history of criminal conduct. It considered the Defendant's prior convictions as evidence contrary to the Defendant's being a favorable candidate for an alternative sentence. *See* Tenn. Code Ann. § 40-35-102(6)(A). It found confinement necessary to protect society from the Defendant and to avoid depreciating the seriousness of the offense and that measures less restrictive than confinement had been applied to the Defendant unsuccessfully. *Id*. at § 40-35-103(1)(A)-(C).

Addressing the enhancement factors, the trial court found that the Defendant had a previous history of criminal convictions and criminal behavior in addition to those necessary to establish the appropriate range. Tenn. Code Ann. § 40-35-114(1). The court

found that the offense involved more than one victim and that the victims were particularly vulnerable due to age and their "pitiful" condition. *Id*. at § 40-35-114(3), (4). The court found that the Defendant failed to comply with conditions of a sentence involving release into the community, noting the Defendant's arrest after trial. *Id*. at § 40-35-114(8). It found the Defendant abused a position of private trust in a manner that significantly facilitated the offense by taking advantage of the sickness, infirmity, and age of her grandparents. *Id*. at § 40-35-114(14). The trial court then imposed consecutive sentencing based on the Defendant's having an extensive record of criminal activity. *Id*. at § 40-35-115(b)(2). The trial court sentenced the Defendant as a Range II, multiple offender to four years' incarceration in count one and imposed a two-year sentence for counts two through five to run concurrently to each other and consecutively to count one, for an effective six-year sentence. The judgments were filed on April 28, 2022.

On May 9, 2022, the Defendant filed a motion for new trial and on June 8, 2022, an amended motion for new trial. In her motion, the Defendant alleged that: (1) the Defendant's due process rights were violated by use of improper inferences to convict the Defendant of forgery; (2) the evidence is insufficient to support a conviction of forgery; (3) reasonable doubt existed because the State presented no evidence of forgery and because the trier of fact's withdrawal of its guilty verdict showed that it had doubts as to the Defendant's guilt; and (4) new evidence should be admitted and considered by the trier of fact, specifically, judgments of nolle prosequi on Mr. Clark's forgery charges and bank records tending to support the Defendant's statement regarding depositing $4,000 into the victims' bank account.

The trial court denied the motion for new trial. This timely appeal followed.

## II.    ANALYSIS

### A.    Sufficiency

The Defendant makes several arguments as to why the evidence is insufficient to support her convictions for forgery, specifically as it relates to whether she had authorization to pass the checks. First, she argues that no testimony or evidence was presented purporting that the checks were forged. To this point, she argues that Mr. Gordon was not a reliable witness, that the trial court relied on a mischaracterization of the Defendant's statements in its verdict, that similar transactions existed with other family members, that the trial court failed to consider transactions it had notice of that tended to support the Defendant's statements, and that the trial court "solely" relied on its history as a trial lawyer and experience with people to render a guilty verdict.

Second, she contends that the trial court admitted reasonable doubt existed when it withdrew its initial oral finding of guilt and that its delay to render a final guilty verdict showed reasonable doubt existed. Lastly, the Defendant argues that the trial court erroneously relied on *State v. Dorantes*, 331 S.W.3d 370 (Tenn. 2011), arguing *Dorantes* failed to differentiate between "irrelevant and obscure circumstantial evidence" and direct evidence and only equated "evidentiary circumstantial evidence and direct evidence."

The State responds that sufficient circumstantial evidence exists to support the Defendant's convictions and that our supreme court has made no distinction between the types of circumstantial evidence that the trier of fact may consider. It further contends that the trial court's actions did not show that reasonable doubt existed.

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id*. (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The law provides this deference to the jury's verdict because

> [t]he jury and the [t]rial [j]udge saw the witnesses face to face, heard them testify, and observed their demeanor on the stand, and were in much better position than we are, to determine the weight to be given their testimony.

> The human atmosphere of the trial and the totality of the evidence before the court below cannot be reproduced in an appellate court, which sees only the written record.

*Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963) (internal quotations and citations omitted). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835. "In a bench trial, the verdict of the trial judge is entitled to the same weight on appeal as a jury verdict." *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (citing *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978)).

Pursuant to Tennessee Code Annotated section 39-14-114(a), "[a] person commits an offense who forges a writing with intent to defraud or harm another." As relevant to this appeal, "forge" means to "[i]ssue, transfer, register the transfer of, pass, publish, or otherwise utter a writing that is forged within the meaning of subdivision (b)(1)(A)." Tenn. Code Ann. § 39-14-114(b)(1)(C). Subdivision (b)(1)(A)(i) further defines "forge" as to "[a]lter, make complete, execute or authenticate any writing so that it purports to . . . [b]e the act of another who did not authorize that act[.]"

Here, there is no dispute that the Defendant endorsed and cashed the checks at issue. Further, it is clear that Mr. Gordon did not authorize the transactions. Thus, the question is whether there was sufficient evidence in the record to find that Ms. Gordon did not authorize the transactions.

Viewed in the light most favorable to the State, the evidence shows that Mr. Gordon reported these five checks as stolen to both law enforcement and First Federal Bank. During questioning, the Defendant made conflicting statements, stating first that Ms. Gordon gave the Defendant these checks because the Defendant had no job or insurance and needed to borrow money for medical bills. She then claimed to have commingled her own funds into the account and drew these checks from her own money, but the Gordons' bank records indicate that $4,000 of the Defendant's money was never deposited into their account, as the Defendant claimed. The Defendant then stated that she repaid the Gordons for these checks with a $1,000 check dated December 19, 2019, with funds that she obtained from Ms. Montgomery's Estate. However, the evidence reflects that this transaction was actually a repayment from a separate $1,000 loan from the Gordons' account. Additionally, the $1,000 was deposited prior to check No. 4055, purportedly written to the Defendant on February 7, 2020, and cashed February 10, 2020, and therefore could not have been a repayment for all the checks at issue. The Defendant further contradicted herself by describing an arrangement where Ms. Gordon would give Ms.

Montgomery checks to cash and give to the Defendant and then stated that she would cash checks from Ms. Gordon and give the money to Ms. Montgomery. Moreover, Mr. Gordon claimed that he and Ms. Gordon were not in the habit of helping others with their bills. *See* Tenn. R. Evid. 406 (providing that evidence of the habit of a person "is relevant to prove that the conduct of the person . . . was in conformity with the habit"). He claimed to only recall Ms. Gordon writing two checks to the Defendant for $15 and $30. While the Defendant challenges the reliability of Mr. Gordon's testimony, the trial court was able to personally observe Mr. Gordon while he testified, and this court does not reweigh or reassess the credibility of witnesses. *See Bland*, 958 S.W.2d at 659 (citing *Cabbage*, 571 S.W.2d at 835); *Carroll*, 370 S.W.2d at 527.

While the Defendant claimed these checks were for medical bills, all five checks were cashed at a bank, were for round numbers, and had greatly varying dates between the date each check was written and when it was cashed, including check Nos. 4028 and 4029, which were both written on October 24, 2019, but cashed eleven days apart. Furthermore, the Defendant admitted to opening a PayPal account linked to the victims' bank account and to having Ms. Gordon write checks to Mr. Clark, all allegedly for medical purposes. While the Defendant only reported conducting three or four PayPal transactions, the evidence shows that twenty-one transactions occurred before the Gordons' bank account was depleted and closed. Several of these transactions were for online purchases and not for cash withdrawals. Also, several transactions involving both the PayPal account and checks written to the Defendant and Mr. Clark occurred while Ms. Gordon was either hospitalized, being admitted or discharged from the hospital, or deceased.

While the Defendant contends that other family members had checks written to them in similar amounts, Mr. Gordon did not report these checks as stolen. During her interview, the Defendant attempted to shift blame to an aunt and uncle, stating they recently bought a new boat, truck, and jet ski. The record reflects, however, that these relatives only received $832.33, which Detective Cox opined was insufficient to purchase these items. Further, the evidence shows that the checks written to the Defendant, the PayPal transactions, and the checks written to Mr. Clark, totaled $6,350.29, more than went to the other family members combined. As such, a trier of fact could infer from the circumstantial evidence and its experience that the checks written to the Defendant were for personal use and not authorized by Ms. Gordon. *See Dorantes*, 331 S.W.3d at 385 (citing *Holland v. United States*, 348 U.S.121, 140 (1954) (stating a jury may use its experience with people and events when weighing the probability of a defendant's guilt based on the circumstantial evidence presented)); *see also State v. Compton*, No. 249, 1986 WL 575, at *1-2 (Tenn. Crim. App. May 7, 1986) (holding the evidence sufficient to support a forgery conviction where witness credibility and circumstantial evidence demonstrated that a defendant's

grandmother did not authorize the checks at issue). Moreover, the trial court credited the testimony of Mr. Gordon and Detective Cox and not the statements made by the Defendant to police, as was its province. *Bland*, 958 S.W.2d at 659.

The Defendant next argues that the trial court erred by not considering the bank records of Shirley Montgomery. The Defendant argued that these records showed a transaction of $4,000, which was the amount the Defendant reported depositing into the victims' account. Regardless of whether the Defendant received this money from her mother's estate, the Gordons' bank records, as we have noted, indicate that this sum was never commingled into their account. In any event, the trial court excluded the records from Ms. Montgomery's estate. A trial court may only consider evidence admitted at trial when rendering a verdict. *See State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017). Therefore, the trial court did not err by failing to consider these records during its deliberations, nor may these records factor into our sufficiency analysis.

The circumstantial evidence presented allowed a logical inference that the Defendant acted without authorization to pass the checks. While the Defendant argues that the trier of fact cannot rely on "obscure" and "irrelevant" circumstantial evidence, our supreme court has made no such distinction between types of circumstantial evidence and we decline to make such a distinction now. The weight and value—both for direct and circumstantial evidence—is resolved by the trier of fact, and we do not reweigh this evidence. *Dorantes*, 331 S.W.3d at 379. Furthermore, all evidence admitted at the trial, even if erroneously admitted, can be considered when addressing a defendant's challenge to the sufficiency of the evidence to sustain the conviction. *See, e.g., State v. Watkins*, 648 S.W.3d 235, 256 (Tenn. Crim. App. 2021) (citing *State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981)). The evidence, therefore, is sufficient to support the Defendant's convictions for forgery.

Relative to the Defendant's contention that the trial court's post-trial actions demonstrated reasonable doubt on its part, we note that the trial court made an initial oral finding of guilt at the November 12, 2021 hearing but did not enter a written verdict at that time. Instead, the trial court held a hearing seven days later and stated that it wanted to further consider a legal question. The trial court rendered a final written guilty verdict four months later and acknowledged that this was a difficult matter to decide. However, the length of a trier of fact's deliberation does not call into question the validity of the verdict. *State v. Gray*, 960 S.W.2d 598, 605 (Tenn. Crim. App. 1997). The Defendant, therefore, is not entitled to relief.

- 13 -

### B. Tennessee Code Annotated section 24-7-122

The Defendant argues that the trial court erred by shifting the burden of service of Ms. Gordon's medical records pursuant to Tennessee Code Annotated section 24-7-122(c) from the State to the Defendant. The State responds that the Defendant failed to show that hospitalization dates fell within the reach of the Code section, that the Defendant had notice of the existence of the records and an opportunity to view them five months prior to trial, and that the Defendant failed to establish exclusion of the records was warranted.

Tennessee Code Annotated section 24-7-122(a) defines "medical records" as "all clinical information that relates to the treatment of individuals, when the information is kept in an institution." Code subsection -122(c) states that the "party desiring to use the records . . . shall serve the opposing party with a copy of the records . . . no later than sixty (60) days before the trial, with notice that the records . . . may be offered in evidence[.]"

The Defendant's argument is moot because the medical records were never entered into evidence. *See State ex rel. Lewis v. State*, 347 S.W.2d 47, 48 (Tenn. 1961) (explaining that a genuine and existing controversy must be presented for adjudication as a court has no right to enter an advisory opinion). During the hearing on the Defendant's motion in limine to exclude these records, defense counsel offered to stipulate to the dates of Ms. Gordon's hospitalization. During trial, the Defendant ultimately reviewed and approved that stipulation, and the medical records were never admitted. The Defendant cannot now challenge the admission of a stipulation that she agreed to at trial. *See* Tenn. R. App. P. 36(a). Further, any such challenge would be waived due to the Defendant's failure to include it in her motion for new trial. Tenn. R. App. P. 3(e), 36(a); *State v. Harbison*, 539 S.W.3d 149, 164 (Tenn. 2018) ("Grounds not raised in a motion for new trial are waived for purposes of appeal.") (citations omitted).

### C. Admission of the PayPal Transactions

The Defendant next argues that the admission of irrelevant PayPal transactions denied her right to a fair trial. To this point, she contends that the trial court erred by failing to hold a Tennessee Rule of Evidence 404(b) hearing to determine their admissibility, that the trial court erroneously admitted the evidence based on the Defendant's opening the door, and that the trial court erred by excluding Ms. Montgomery's bank records to counter the State's advantage on this point. The State responds that the Defendant has waived this issue by failing to object to the PayPal transactions on these grounds at trial. We agree with the State and hold that the issue is also waived for an additional reason not raised by the State.

The Defendant's statement to police, wherein she described linking a PayPal account to her grandparents' bank account and conducting only three or four transactions between those accounts, was admitted into evidence without objection by the Defendant. When Detective Cox later testified that, in fact, twenty-one transactions had been made between these accounts, the Defendant did not object on constitutional fair trial grounds but only on relevance grounds. In her motion for new trial pleadings, she excluded any mention of the PayPal evidence. To the extent that she argued in these pleadings that her verdict was based upon general "improper influences," she framed this as a due process violation and not a relevance issue or a fair trial violation. Now, for the first time on appeal, she raises a fair trial claim related to the admission of the PayPal evidence.

"An appellate court's authority 'generally will extend only to those issues presented for review.'" *State v. Bristol*, 654 S.W.3d 917, 923 (Tenn. 2022) (quoting Tenn. R. App. P. 13(b)). Further, the appellate rules do not require relief to be granted "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of the error." Tenn. R. App. P. 36(a). Appellate jurisdiction "extends to those issues that 'ha[ve] been formulated and passed upon in some inferior tribunal.'" *Bristol*, 654 S.W.3d at 925 (alteration in original) (quoting *Fine v. Lawless*, 205 S.W. 124, 124 (Tenn. 1918)). The party who wishes to raise an issue on appeal first has an obligation to preserve that issue by raising a contemporaneous objection in the trial court. *See State v. Vance*, 596 S.W.3d 229, 253 (Tenn. 2020). An objection must state "the specific ground of objection if the specific ground was not apparent from the context[.]" Tenn. R. Evid. 103(a)(1). Further, in order to preserve an issue for appeal, it is sufficient for the objecting party to inform the trial court of "(1) the action that the party desires the court to take; or (2) the party's objection to the action of the court and the grounds for the objection." Tenn. R. Crim. P. 51(b). If such an objection is made, the party must also include the issue in a motion for new trial in order to avoid appellate waiver. *See* Tenn. R. App. P. 3(e), 36(a); *Harbison*, 539 S.W.3d at 164.

Appellants cannot raise an issue for the first time on appeal nor can they change their arguments on appeal. *See Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983); *see also* Tenn. R. App. P. 36(a). In other words, "a party may not take one position regarding an issue in the trial court, change his strategy or position in mid-stream, and advocate a different ground or reason" on appeal. *State v. Dobbins*, 754 S.W.2d 637, 641 (Tenn. Crim. App. 1988).

Appellate courts have the discretion to consider an issue under plain error review even when a defendant has failed to properly preserve that issue for appeal. *State v.*

- 15 -

*Bledsoe*, 226 S.W.3d 349, 353 (Tenn. 2007); *see* Tenn. R. App. P. 13(b). "When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). Our supreme court has advised appellate courts to exercise plain error review sparingly. *Bledsoe*, 226 S.W.3d at 354. As such, it is a defendant's burden to show that the issue is entitled to plain error relief. *Id.* at 355.

First, we agree with the State that the Defendant has waived this claim because no contemporaneous objection was lodged at trial on the bases that the Defendant now seeks to raise on appeal. Tenn. R. App. P. 36(a); *Vance*, 596 S.W.3d at 253. The Defendant objected to the PayPal transactions solely on relevance grounds and may not now abandon this ground for relief in favor of asserting a new ground based on a constitutional fair trial claim. *Dobbins*, 754 S.W.2d at 641. We additionally conclude that the Defendant's failure to include the PayPal transactions or a fair trial claim in her motion for new trial also constitutes waiver of the issue. *See* Tenn. R. App. P. 3(e), 36(a); *Harbison*, 539 S.W.3d at 164. Further, despite the State's having argued for waiver in its principal brief, the Defendant has failed to request plain error review. Without a request, we decline to conduct such a review. *See Bledsoe*, 226 S.W.3d at 353-54; *State v. Thompson*, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023) (declining to conduct plain error review absent the defendant's request and explaining "where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our sua sponte consideration of plain error").

### D. Cumulative Error

The Defendant argues that she is entitled to relief due to the cumulative effect of the errors of the trial court. Along with the Defendant's contentions addressed above, the Defendant also argues that the trial court erred by considering the actions of Mr. Clark, by assessing the Defendant for sentencing prior to entering a final verdict, and, as a general contention, that the trial was "too short."

The cumulative doctrine is a "judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant review under the cumulative error doctrine, more than one actual error must have occurred in the trial proceedings. *Id.* at 77.

Because we have rejected each of the Defendant's above allegations of error related to the trial proceedings, her argument that she is entitled to relief based on the cumulative error doctrine fails. *See id.* at 76-77. While the Defendant attempts to raise independent claims of error as part of her cumulative error claim, she fails to cite to any authority related to these issues in her brief. *See* Tenn. R. App. P. 27(a)(7). As such, these specific contentions are waived. Tenn. Ct. Crim. App. R. 10(b).

E.      Sentencing

The Defendant argues that her effective sentence of six years' incarceration is disproportional to her five convictions for forgery in violation of the Cruel and Unusual Punishment Clause of the Eighth Amendment and article I, section 16 of the Tennessee Constitution.[4] Specifically, she contends that forgery is a nonviolent crime and generally does not garner a sentence to serve. The State responds that the Defendant's sentence is not grossly disproportional to her offenses. We agree with the State.

The Eighth Amendment to the United States Constitution and article I, section 16 of the Tennessee Constitution prohibit "cruel and unusual punishments." In order to comport with these constitutional provisions, a sentence may not be "grossly disproportionate" to the crime committed. *See State v. Harris*, 844 S.W.2d 601, 603 n.3 (Tenn. 1992) (citing *State v. Black*, 815 S.W.2d 166, 189 (Tenn. 1991)). The *Harris* court adopted the methodology espoused in Justice Kennedy's concurrence in *Hamerlin v. Michigan* to determine whether a defendant's sentence is proportionate. *See id*. at 603 (citing *Hamerlin*, 501 U.S. 957, 996-1009 (1991) (Kennedy, J., concurring in part and concurring in the judgment)). Under this analysis, the sentence imposed is initially compared with the crime committed. *Id*. Unless this threshold comparison leads to an inference of gross disproportionality, the inquiry ends, and the sentence is constitutional. *Id*. "In those rare cases where this inference does arise, the analysis proceeds by comparing (1) the sentences imposed on other criminals in the same jurisdiction, and (2) the sentences imposed for commission of the same crime in other jurisdictions." *Id*.

"Determining whether a penalty for a particular offense raises an inference of gross disproportionality entails a comparison between the gravity of the offense and the

---

[4] The Defendant briefly argues that the trial court did not afford her a presumption of alternative sentencing. She cites no authority for this argument, and it is therefore waived. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). In any event, the Defendant is a multiple offender and is therefore not eligible to "be considered as a favorable candidate for alternative sentencing options[.]" *See* Tenn. Code Ann. § 40-35-102(6)(A).

harshness of the penalty." *State v. Smith*, 48 S.W.3d 159, 171 (Tenn. Crim. App. 2000) (citing *Solem v. Helm*, 463 U.S. 277, 290-91 (1983)). Relevant factors for this comparison include

> (1) the nature of the crime, including whether society views the crime as serious or relatively minor and whether the crime is violent or non-violent; (2) the circumstances of the crime, including the culpability of the offender, as reflected by his intent and motive, and the magnitude of the crime; and (3) the existence and nature of any prior felonies if used to enhance the defendant's penalty.

*Id*. "Factors relevant to the harshness of a penalty include the type of penalty imposed and, if a term of imprisonment, the length of the term and the availability of parole or other forms of early release." *Id*. "[B]ecause reviewing courts should grant substantial deference to the broad authority legislatures possess in determining punishments for particular crimes, '[o]utside the context of capital punishment, *successful* challenges to the proportionality of particular sentences [will be] exceedingly rare.'" *Harris*, 844 S.W.2d at 602 (quoting *Solem*, 463 U.S. at 289-90) (alterations and emphasis in original).

Here, the proof at sentencing showed the Defendant had an extensive history of theft-related convictions and had committed theft while awaiting a verdict for her present forgery offenses. The trial court found the following enhancement factors applicable: (1) the Defendant had a previous history of criminal convictions and criminal behavior in addition to those necessary to establish the appropriate range; (2) the offense involved more than one victim; (3) the victims were particularly vulnerable due to age; (4) the Defendant had failed to comply with conditions of a sentence involving release into the community; and (5) the Defendant abused a position of private trust in a manner that significantly facilitated the offense. *See* Tenn. Code Ann. § 40-35-114. Although these offenses were nonviolent in nature, the offenses led to the complete depletion of the victims' only bank account. The record demonstrates that the Defendant had six felony convictions prior to the forgeries in this case. The Defendant's effective sentence of six years for the commission of five Class E forgery offenses is within the allowable range of punishment for a single commission of this offense under state law. *See id*. § 40-35-111(b)(5). Also, the Defendant, a Range II offender, will be eligible for parole after service of thirty-five percent of her sentences. *See id*. § 40-35-501(d). Furthermore, this court has upheld lengthy sentences for nonviolent offenses against proportionality challenges. *See State v. Sweet*, No. E2010-00728-CCA-R3-CD, 2011 WL 6318506, at *54-55 (Tenn. Crim. App. Dec. 16, 2011) (holding that a sixteen-year sentence for the defendant's two convictions for forgery and two convictions for criminal stimulation was not grossly disproportional);

*Galbreath v. State*, No. M2003-02807-CCA-R3-PC, 2005 WL 119534, at \*23-25 (Tenn. Crim. App. Jan. 19, 2005) (upholding a thirty-six year sentence for fraudulently obtaining prescription drugs on twelve occasions as not grossly disproportional).

For these reasons, we conclude no inference of gross disproportionality arises in this case. The Defendant's effective sentence of six-years' incarceration is therefore constitutional, and there is no need to compare her sentence with sentences imposed for similar offenses in this or other jurisdictions. *See Harris*, 844 S.W.2d at 603. The Defendant is not entitled to relief.

### III.    CONCLUSION

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
KYLE A. HIXSON, JUDGE